```
IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

| | | |
|---|---|---|
| RAHEEMA HOWARD,<br>  *Individually and as Administratrix for the*<br>  *Estate of Ricky Howard* | :<br>:<br>:<br>: | CIVIL ACTION |
| v. | : | No. 10-3184 |
| SHAMAYA ALLEN-BULLOCK, et al.<br>  *Police Officer, Badge #1481, Individually*<br>  *and as Police Officer for the City of*<br>  *Philadelphia* | :<br>:<br>:<br>:<br>: | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                                                March 23, 2011

Defendants Shamaya Allen-Bullock (Allen) and the City of Philadelphia ask this Court to grant summary judgment in their favor on Plaintiff Raheema Howard's 42 U.S.C. § 1983 and Pennsylvania state law claims, which Howard brought on behalf of her deceased husband, Ricky Howard. Because Defendants have failed to show there is no genuine dispute as to any material fact, this Court will deny their motion.

**FACTS**

This case arises from the fatal shooting of Raheema Howard's husband, Ricky, by Allen, a Philadelphia police officer. While the circumstances of Ricky Howard's death are hotly disputed by the parties, they agree on the following facts. On March 26, 2008, Ricky Howard became involved in a scuffle with another man, Edward Parks, in which both men were struggling to gain control of a gun. Responding to a call of shots fired, Allen arrived at the scene, a parking lot near 30th Street and Lehigh Avenue in Philadelphia, and saw the men struggling over an object. As she approached the men with her firearm drawn, she identified the object as a gun. She directed the men to drop the gun a number of times before shooting twice. Both shots she fired hit Ricky Howard, and he died from the gunshot injuries he sustained.

The events which unfolded immediately before Allen fired her gun are in dispute. Allen asserts that, when she told both Parks and Howard to drop the gun, Parks complied and stepped away from Ricky Howard while Howard "rolled over and pointed the gun directly at [her]." Defs.' Statement of Undisputed

Facts ¶ 40. Then, "[f]earing for her life, PO Allen discharged her weapon twice at Ricky Howard." *Id.* at ¶ 41. Raheema Howard, on the other hand, contests Allen's account, arguing the testimony of Allen's supervisor, Sergeant Nicholas Smith,[1] her colleague, Inspector Rebstock,[2] and eye witness Elaine Smith[3] cumulatively suggests Ricky Howard never separated from Parks, never gained exclusive control of the gun, and never pointed the gun at Allen. Instead, Raheema Howard suggests her husband was being robbed by Parks and was struggling with Parks to avoid being shot before he was fatally shot by Allen.

Howard filed her Complaint in the Court of Common Pleas in Philadelphia on June 23, 2010, claiming Allen and the City of Philadelphia violated her husband's constitutional rights by Allen's use of lethal force against him. She also brought assault and battery claims against Allen pursuant to Pennsylvania law. On June 30, 2010, the City of Philadelphia removed the case to this Court and, following the close of discovery, Defendants seek an entry of summary judgment in their favor.

**DISCUSSION**

Viewing the evidence in the light most favorable to the non-movant, summary judgment shall be

---

[1] Smith spoke to Allen immediately after the shooting, and testified she told him she saw two men fighting on the ground and "the gun came towards her" before she discharged her weapon. *See* Pl.'s Resp. Ex. B, Smith Dep., Oct. 18, 2010. According to Smith, Allen did not say that the men separated from each other, that Parks dropped the gun and stepped away, or that Howard rolled onto his back and pointed the gun at her.

[2] Rebstock testified that he also responded to the scene of the struggle between Howard and Parks and said he kept Allen under observation. When he approached the men, he did not see them struggling on the ground. Instead, he saw the men in a squat position with one man's arms around the other, though they moved through multiple positions. Rebstock heard Allen repeat, "let me see your hands" several times. Then, she screamed "gun" and fired two shots. When Allen fired, she blocked Rebstock's line of view so that he could not see the two men, but before she fired he did not see either man point a gun at Allen. *See* Pl.'s Resp. Ex. C, Rebstock Dep., Nov. 9, 2010.

[3] In Smith's unsworn declaration, she stated she did not see Howard point a gun at Allen. *See* Pl.'s Resp. Ex. D. Defendants argue this Court should not consider Smith's declaration because it is unsworn, arguing Federal Rule of Civil Procedure 56 requires witness statements to be made by affidavits. Under the 2010 Congressional amendments to Rule 56, however, "[a] formal affidavit is no longer required." Fed. R. Civ. P. 56 advisory committee's note. Instead, "a written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury" can be used in place of an affidavit. *Id.* Such an unsworn statement has been submitted, and this Court will consider it.

granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute over a material fact is "genuine" if resolution of such fact would permit a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In her response to Defendants' motion for summary judgment, Raheema Howard states she is abandoning her Pennsylvania law claims. Thus, this Court will address Howard's sole remaining claim, asserted on her deceased husband's behalf pursuant to 42 U.S.C. § 1983, in which she argues (1) Allen violated her husband's Fourth Amendment rights by using excessive and lethal force against him, and (2) the City of Philadelphia is liable for failing to properly train its police officers and for its custom of responding with deliberate indifference to excessive force used by members of its police force.

To prove a violation of Ricky Howard's Fourth Amendment rights, Howard must show her husband was seized, and such seizure was unreasonable. *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989). There is "no question" a police officer's use of deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Thus, the material factual dispute at issue in this case is whether Allen's actions were reasonable. The use of lethal force is only reasonable when "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* at 3; *see also Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999) ("[T]he ultimate question is not whether [the police officer] really was in danger as a matter of fact, but . . . whether it was objectively reasonable for her to believe that she was."). Reasonableness is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Here, Allen asserts her actions were reasonable because Ricky Howard pointed a gun at her. Her account of the events, however, is undermined by the reports of other police officers and witnesses who did

3

not see him take such an action. Because the victim of a police officer's deadly force is unable to testify, the Third Circuit has instructed district courts to "be cautious on summary judgment to ensure that the officer is not taking advantage of the fact that the witness most likely to contradict [her] story - - the person shot dead - - is unable to testify." *Abraham*, 183 F.3d at 294 (citation and internal quotation marks omitted). In exercising this caution, a district court "should avoid simply accepting what may be a selfserving account by the officer[]. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact finder that the officer[] acted unreasonably." *Lamont v. New Jersey*, No. 09-1845, 2011 U.S. App. LEXIS 4104, at *9 (3d Cir. Mar. 4, 2011) (citing *Abraham*, 183 F.3d at 294) (quotation marks and internal alterations omitted). Raheema Howard has presented evidence which, if believed by the jury, calls into question Allen's account of the events before she shot Ricky Howard. Specifically, if Ricky Howard never had exclusive control of the firearm at issue, and never pointed the gun at Allen, the jury may find it was not objectively reasonable for Allen to believe she was in danger and to shoot Howard. Furthermore, if neither man pointed the firearm at issue at Allen, a reasonable jury can find Allen violated Howard's Fourth Amendment rights. Because there is a genuine factual dispute regarding what transpired before Allen shot Howard, summary judgment for Allen will be denied.

Allen argues in the alternative that, even if this Court determines there is a genuine dispute over a material issue of fact sufficient to permit this case to be heard by a jury, Allen is entitled to qualified immunity because her actions did not violate clearly established law. The qualified immunity doctrine shields a government official "from liability for civil damages insofar as [her] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies, a court must consider, viewing the facts in the light most favorable to the plaintiff, (1) whether there was a violation of a constitutional right and (2) whether such a right was clearly established at the time of the violation.

4

*Saucier v. Katz*, 533 U.S. 194, 201 (2001). Because this Court has found that, when the evidence is viewed in the light most favorable to Howard, Allen violated Howard's constitutional rights, only the second *Saucier* factor will be addressed.

With regard to the second factor, Allen argues "no objectively reasonable police officer would have known that discharging his or her weapon at a person pointing a gun at the officer would be considered an excessive use of force and therefore violate the clearly established law." Def.'s Mot. for Summ. J. 8. In making this argument, however, Allen fails to view the facts in the light most favorable to the non-moving party, as this Court must do in reviewing Allen's motion. Here, this Court has determined that a triable issue of fact exists as to whether Allen violated Howard's Fourth Amendment rights. "Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis." *Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002). Here, if all factual disputes are resolved in Howard's favor at trial, and the jury determines Howard did not pose a threat to Allen or others around her, then Allen would not be protected by qualified immunity because a police officer's use of lethal force against a non-threatening person is a clearly established violation of the individual's constitutional rights. *See, e.g., Garner*, 471 U.S. at 11 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."). Thus, the disputed facts go directly to the heart of the qualified immunity analysis, and this Court cannot grant qualified immunity at this time.

Finally, the City of Philadelphia argues this Court should dismiss Howard's claims against it because Howard will be unable to prove a basis for municipal liability pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Under *Monell*, a municipality cannot be held liable through respondeat superior principles, but it may be held liable if a plaintiff shows the municipality, "under color of some official policy, 'cause[d]' an employee to violate another's constitutional rights." 436 U.S. at 694. A policy or custom may exist when "the policymaker has failed to act affirmatively at all, [even though] the need to

take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been indifferent to the need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (citation and internal quotation marks omitted). In addition to establishing the existence of a municipality's policy or custom, a plaintiff also "must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged," showing "a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404-05 (1997).

Raheema Howard argues the following long-standing customs of the City of Philadelphia proximately caused the death of her husband: "(1) [permitting] inadequate and biased investigations of police[-]involved shootings; and (2) [condoning] officer actions that unnecessarily precipitate the use of deadly force." Pl.'s Resp. 9. At oral argument on this motion, Howard further clarified her two arguments as a failure to investigate and a failure to train claim. In support of her argument these customs exist, Howard attaches (1) a 2005 report prepared by the Integrity and Accountability Office (IAO) of the Philadelphia Police Department (PPD), entitled "Officer-Involved Shootings," which studied shootings by Philadelphia police officers and found poor tactics used by the officers were contrary to their training and resulted in injuries to both officers and civilians, Ex. E; (2) a 2003 IAO report regarding police disciplinary procedures which found serious problems with the department's imposition of police discipline, Ex. F;[4] and (3) an expert report authored by Dr. R. Paul McCauley, in which McCauley opined the Police Department's "continued custom of failing to take reasonable post-shooting investigative actions . . . reflects a deliberate indifference to . . . the safety and well-being of citizens and officers," Ex G, Memorandum from R. Paul

---

[4]Defendants argue this Court should not consider the observations, findings, or recommendations of the IAO reports because such statements are inadmissible hearsay. This Court finds these reports may be used for the non-hearsay purpose of showing the City of Philadelphia had notice of potential deficiencies in its officer-involved shooting investigations and officer discipline programs.

6

McCauley, Ph.D., FACFE on Civil Action 10-3184, 31 (Jan. 24, 2011) (McCauley Report).

The 2005 IAO report was created with a goal of assessing "whether the PPD has effective and meaningful policies and practices in place to insure that deadly force is only used as authorized by law and policy and that when it is not, that the PPD takes all reasonable and necessary measures to address these problematic shootings." Ellen Green-Ceisler, *Integrity and Accountability Office, Philadelphia Police Department, Officer Involved Shootings* 2 (Feb. 2005). The IAO based its conclusions on its review of the PPD's internal investigations into police-involved shootings. Thus, although the IAO found, "[i]n the majority of officer-involved shootings reviewed for [the] study . . . the officer(s) had a reasonable basis to believe that they, or others, were in imminent danger of serious injury or death at the moment they fired their weapons," *id.* at 5, this finding is undermined by the IAO's determination that such investigations were one-sided, incomplete, and untimely.[5] *See id.* at 36.

Additionally, the 2005 IAO Report concluded that "[q]uestionable tactics and judgment are being

---

[5] With regard to the PPD's model for investigating officer-involved shootings, the 2005 Report found that, while the majority of investigations into officer-involved shootings are satisfactory, there are necessary areas of improvement, including the following:

> Violations of important Departmental policies that occurred before, during, or after shooting incidents were not consistently identified or addressed.
>
> Witness interviews are generally formulaic and some are of poor quality. In some cases, investigators did not ask necessary and probing questions regarding issues relevant to the shooting, did not always address inconsistencies and ambiguities, and at times asked improper leading questions. In some investigations, physical evidence and civilian eyewitness statements that contradicted officers' version of events appeared to be disregarded. These practices raise questions regarding the impartiality of some investigations.
>
> Witness interviews are recorded either by hand or with the aid of word-processing equipment. In some instances, interviews are not recorded verbatim, but rather, are paraphrased or summarized. These outdated and ineffective methods of recording witness interviews are highly problematic and impact adversely on the quality of the investigations.

*Id.* at 36.

utilized by some Philadelphia police officers – increasing the likelihood and precipitating the need to use deadly force when other less dangerous responses are available." *Id.* at 55. These "questionable tactics" occurred frequently where officers engaged in foot pursuits of suspects or split up from their partners, and include instances where "officers rushed unwittingly into dangerous situations, without a plan or course of action, [and] without assessing their personal safety or that of other officers or the public." *Id.* The IAO found such questionable tactics "violate fundamental officer safety precepts; are contrary to basic PPD training; and result in injuries and deaths to officers, suspects, and innocent citizens." *Id.* at 60. Moreover, the poor tactics "placed the officers in unnecessarily exposed and vulnerable positions, virtually assuring the fact that deadly force would be the officer's only option if the situation escalated." *Id.* After discussing case studies with PPD officers, commanders, and firearms experts from other law enforcement agencies, the IAO found PPD officers engage in unsound and unsafe tactics because of inadequate training, peer pressure, a "John Wayne Syndrome," and because "the PPD's system of rewards and incentives actually encourages poor tacitcs." *Id.* at 61.

In his expert report, McCauley opines the violation of Ricky Howard's constitutional rights was caused by the City's failure to take appropriate post-shooting investigative actions, reasoning that "[w]hen the leadership fails to swiftly and meaningfully sanction identified misconduct and corruption it sends a clear message that such behavior is acceptable, thereby encouraging similar behavior by others." McCauley Report at 27. McCauley further opines the custom of failing to investigate and/or discipline violations of individuals' rights is reinforced by the "code of silence" which operates as an un-written rule that police officers do not take action to expose their fellow officers' actions to scrutiny or discipline.

Raheema Howard has presented sufficient evidence to create a genuine issue of fact as to whether the alleged customs of the Philadelphia Police Department exist. Proof of an unlawful custom is not enough, however, as Howard also must show a reasonable jury could find the claimed municipal custom was the

proximate cause of the injuries she suffered. *See Losch v. Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984). "To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (citations omitted) ("[T]he plaintiffs need not demonstrate that their injuries were the *direct* result of *formal* departmental procedures or encouragement in order to satisfy the nexus requirement.").

Here, Howard first argues Philadelphia police officers are inadequately trained. She acknowledges that Directive 10, a policy regarding discharges of firearms by police personnel, requires PPD officers to "exhaust all other reasonable means of apprehension and control before resorting to the use of deadly force" and admonishes that "officers should ensure their actions do not precipitate the use of deadly force by placing themselves or others in jeopardy by taking unnecessary, overly aggressive, or improper actions." Defs' Mot. for Summ. J. Ex. D. She argues, however, that training related to Directive 10 is too infrequent and so ineffective that it is quickly superseded by bad practices learned from other officers on the street, such as practices in which PPD officers unnecessarily precipitate the use of deadly force by rushing headlong into dangerous situations without a plan in place. A municipality's failure to train its police officers can give rise to a constitutional violation "only when that failure 'amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1060 (3d Cir. 1991) (quoting *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)). A municipality can *not* be found deliberately indifferent on a failure to train theory through (1) evidence of the shortcomings of an individual officer; (2) "proving that an otherwise sound training program occasionally was negligently administered; or (3) showing, without more, that better training would have enabled an officer to avoid the injury-causing conduct." *Id.* Based on the evidence presented by Howard, including the 2005 IAO Report's finding that "[t]he PPD's in-service firearms training programs do not adequately prepare officers for the

realities and challenges of policing in today's urban environment," this Court finds a reasonable jury could find the City was deliberately indifferent to inadequate officer training which has thus caused officers to precipitate the unnecessary use of deadly force. This Court will deny summary judgment as to this argument.

Next, Howard argues because the City does not thoroughly and impartially investigate officer-involved shootings it has blinded itself to the holes in its training program and, by imposing inconsistent and ineffective discipline, the City has actually encouraged inappropriate behavior and reckless tactics. Both the Third Circuit and the Supreme Court have endorsed the proposition that "it is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future." *Bielevicz*, 915 F.2d at 851 (citing *Brandon v. Holt*, 469 U.S. 454 (1985)). *Bielevicz* further instructed, "[i]f the City is shown to have tolerated known misconduct by police officers, the issue whether the City's inaction contributed to the individual officers' decision to [violate the plaintiffs' constitutional rights] is a question of fact for the jury." 915 F.2d at 850. Although this case presents a close question, because the causal link alleged by Howard is not "too tenuous," the question of whether the City of Philadelphia maintained a custom sufficient to impose liability upon it for Allen's alleged constitutional deprivations, and whether such custom proximately caused Ricky Howard's Fourth Amendment violation, shall be left to the jury. Accordingly, Defendants' motion for summary judgment is denied.

An appropriate order follows.